UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: 1 IPHONE MODEL A1533, IMEI: 013987001042731 | Misc. No. _____ <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Robert Mayo, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search 1 IPHONE MODEL A1533, IMEI:

013987001042731, hereinafter "THE DEVICE," further described in Attachment A, for the

things described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have

been since 2016.  I am currently assigned to the FBI Washington Field Office ("WFO").  As part

of my duties at the WFO, I am assigned to investigate various criminal matters in Washington

D.C.  In preparation for this assignment, and as part of my continuing education, I have

successfully completed various trainings, to include formal courses and training exercises.  I

have participated in all aspects of criminal investigations, including arrest operations, swearing

out search warrants, conducting physical surveillance, telephone, email, and financial analysis

obtained as a result of subpoenas, subject interviews, witness interviews, electronic surveillance,

and operations of confidential human sources.  I am a Special Agent with the FBI, within the

meaning of 18 U.S.C. § 3052, and as such I am an officer of the United States who is authorized

to investigate offenses against the United States and to execute warrants issued under the authority of the United States.

3.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of, *inter alia*, 18 U.S.C. § 922(g) have been committed by Allan James, also known as Made Mane Yusuf.  There is also probable cause to search the subject property described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

4.      As detailed below, there is probable cause to believe that a subject named Allan James used THE DEVICE, to facilitate the illegal sale of firearms in the District of Columbia. Search and arrest warrants issued by this court for the subject's Facebook, Snapchat, and Gmail accounts, and other investigative steps taken by the FBI, have led to the identification of multiple cellular telephones, including THE DEVICE, used by the subject that likely contain photographs of guns and discussions of illegal firearm transactions.

5.      On or about September 27, 2016, Witness 1 ("W-1"), a U.S. Probation Officer who works in Baltimore, Maryland, contacted the FBI regarding an individual W-1 had previously supervised named Allan James, date of birth August 5, 1988.  According to the information provided by W-1, Allan James' address of record at the time of supervision was in Baltimore, MD.  W-1 indicated that as of October 2016, Mr. James was no longer under its agency's supervision.

6.      W-1 informed the FBI that it had previously supervised Allan James in connection with Mr. James' supervised release following his conviction in D.C. Superior Court for one count of robbery and one count of attempted robbery.  Your affiant is aware that

according to court records and law-enforcement databases, prior to July 12, 2017, JAMES was convicted of one count of Robbery and one count of Attempted Robbery in D.C. Superior Court; and one count each of Taking of a Motor Vehicle and Armed Carjacking in Prince George's County, Maryland.  Each of the above convictions is punishable by a term of incarceration in excess of one year.

7.      Your affiant is aware that it is unlawful for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to, *inter alia*, ship, transport, or possess "any firearm . . . which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(g)(1).  Your affiant is moreover aware that there are no commercial firearms manufacturing facilities located within the District of Columbia and that Glock has no manufacturing facilities in the District of Columbia, Maryland, or Virginia.

8.      W-1 explained that it was aware of a Facebook page that appeared to belong to Allan James, operating under the alias "Made Mane Yusuf."  W-1 stated that the "Made Mane Yusuf" page includes multiple photos of its former supervisee Allan James.  W-1 stated that in addition to the photographs of Mr. James, the "Made Mane Yusuf" page included videos of guns and discussions about the sale of guns.

9.      Your Affiant has reviewed the public portions of the "Made Mane Yusuf" Facebook page as recently as September 22, 2017.  The page included numerous photographs of an individual who appears to match known law-enforcement photographs of an individual named Allan James, Date of Birth August 5, 1988.  The page also included a video of an individual who appeared to be Mr. James in possession of a gun inside of a residence, which was posted on April 3, 2016, as well as another video ("Vid 1") of what appears to be three guns and the phrase

"Back on dat action," which was posted on August 9, 2016.[1] Mr. James posted that one of the guns in Vid 1 was a "Glock 45."  Your affiant also observed references to the sale of guns and arrangements to meet for the sale of guns.

10.     On July 12, 2017, Mr. James was arrested by Washington, D.C. Metropolitan ("MPD") Police and charged by MPD with the following offenses: Felony Possession of a Firearm, Possession of a Large Capacity Ammunition Feeding Device, Carrying a Pistol Without a License (Outside Home or Place of Business), Possession of an Unregistered Firearm/Unlawful Possession of a Firearm or Destructive Device, and Possession of Unregistered Ammunition. He was subsequently charged via complaint in Superior Court for the District of Columbia with one count of Unlawful Possession of a Firearm.  During this incident, Mr. James allegedly fled after being approached by MPD officers who observed Mr. James' conducting suspicious activity. During the pursuit, Mr. James allegedly discarded one Glock 22 pistol, one high-capacity ammunition magazine, and 15 rounds of .40 caliber ammunition.

11.     Mr. James' conditions of release in the Superior Court case include home confinement (with specified exceptions) to an address verified by PSA and electronic monitoring to ensure compliance with that home confinement.  On September 8, 2017, PSA reported that Allan James was residing at 4184 Livingston Road, Apartment 202, SE, Washington, D.C. (PREMISES) as of August 1, 2017.  Moreover, your affiant has reviewed the public docket in

---

[1] Previous affidavits submitted in connection with other search warrants in this investigation stated that the video was posted on August 10, 2016.  On the public-facing portion of Facebook, it appears that the video was posted on August 10 because conversation about it occurred on that date.  A review of the Facebook search warrant returns discussed below revealed that the video was actually posted on August 9.

the Superior Court case and has found one reported violation of Mr. James' conditions of release. His alleged violation was a curfew violation.

12.     On September 22, 2017, your affiant physically observed Mr. James exit the front door of the building that contains the PREMISES at approximately 5:45 AM. Mr. James then boarded a Washington Metropolitan Area Transit ("WMATA") authority bus heading westbound on Atlantic Avenue, in Southeast, Washington, D.C. According to records provided by WAMTA, the fare card utilized by Mr. James last exited the WMATA transportation system at the Arlington National Cemetery Metro Rail station, on the same day.

13.     Videos provided by Facebook via search warrant returns suggest that Mr. James has worked at Arlington National Cemetery over the past 6 months. Based on PSA electronic monitoring, the time Mr. James was observed, and the travel pattern provided by WMATA, it appears that Mr. James was exiting the building to go to work.  Based on this, as well as the aforementioned surveillance and PSA's representations, your affiant submits that there is probable cause to believe that Mr. James now resides at the PREMISES.

14.     On September 27, 2017 this court issued a search warrant to search the PREMISES for items including "Firearms, ammunition, magazines, or related paraphernalia" and "Cellular telephones, smartphones, or personal data assistant devices" that may contain evidence of illegal weapon possession by Mr. James. One broken cellular telephone was seized during the execution of this search warrant. Additionally, 1 .40 caliber, extended, 30 round, Glock-style magazine was recovered during the search. Placed inside this magazine were two bullets that appear to match pictures of the ammunition seized by MPD, pursuant to their arrest of him on July 12, 2017.

15.     On October 3, 2017 a bench warrant was issued by this court for Mr. James for violation of 18 U.S.C. 922(g)(1), Possession of a Firearm By A Convicted Felon. Mr. James was arrested on October 4, 2017 outside of the PREMISES. During a search pursuant to the arrest, THE DEVICE was found in the possession of Mr. James. Specifically, Mr. James was observed talking on THE DEVICE as agents approached, and threw THE DEVICE to the ground as agents informed Mr. James that he was under arrest.

16.     Your affiant is aware, from his training and experience, as well as discussions with agents and FBI task force officers with experience with firearms investigations that persons involved in the illegal trafficking of firearms also utilize social media accounts such as Facebook to facilitate illegal firearms transactions. The electronically stored information on these accounts is of evidentiary value in identifying other members of the illegal firearm trafficking conspiracy and establishing the relationship between these individuals. Firearm traffickers have been known to post photos of themselves with firearms or proceeds from the sales of illegal substances on such websites as Facebook.

17.     Moreover, persons involved in the illegal trafficking of firearms keep and maintain records of their various activities. Experience in similar cases has established that such records can be concealed in a suspect's social media accounts, and these accounts may be accessed utilizing digital devices that one typically stores on their person, or in their residence.

18.     On February 15, 2017, your affiant served a search warrant on Facebook Incorporated, related to Facebook ID 100009637007893 ("Mr. James' Facebook Account"), which corresponds with Facebook username "Made Mane Yusuf."  The search warrant return ("FBW 1") revealed that Mr. James' Facebook Account is registered to email address

allanj2845@gmail.com ("Email 1"). Moreover, according to U.S. Probation records, as recently as September 27, 2016, Email 1 was listed as an email address for Mr. James.

19.     On or about April 6, 2017, your affiant served Google, Incorporated with a search warrant related to Email 1. The search warrant revealed multiple utility-related emails for Allan James, whose service address was listed as 4196 Livingston Road. SE, Washington, D.C. (Address 1). Additionally, an email sent by Email 1 to a known employer of Mr. James, contained a photograph of a Maryland state identification card for Allan Alphonso James, date of birth August 5, 1988.

20.     FBW 1 revealed multiple pictures of Mr. James possessing what appears to be various types of firearms, including semi-automatic assault rifles equipped with high-capacity magazines.  Additionally, Mr. James' Facebook Account contained six videos of what appears to be Mr. James possessing multiple types of firearms, including semi-automatic pistols, and a revolver.  Moreover, Mr. James' Facebook Account also contained no less than four private discussions between Mr. James and various Facebook users, which appear to indicate that Mr. James is selling, trading, and attempting to purchase firearms, ammunition, and ammunition magazines, including high-capacity magazines, across state lines.

21.     On May 16, 2016, the user of Mr. James' Facebook Account discussed in private messages with multiple Facebook users what appears to be the transport, sale, and trade of a firearm across state lines.  Specifically, the user of Mr. James' Facebook Account sent a private message to Facebook account 100009269833710 ("Facebook Account 3710"), stating, "Coming back frm Bmore omw to se I got a Mac I'm tryna get two hand joints."  On the same date, Mr. James' Facebook Account sent a photograph of what appears to be a Military Armament Corporation Model 10 style machine pistol (commonly referred to as "MAC 10" or "Mac") and

ammunition to another Facebook user 100000594924494 (" Facebook Account 4494"), stating, "Give me two hand joints."  Based on my training and experience, I know that "joint" is commonly used as a slang term for "gun" in the District of Columbia area.

22.     On May 25, 2016, Facebook Account 4494 and Mr. James' Facebook Account appeared to discuss in a private message another possible sale and trade of what appears to be various types of firearms.  The user of Facebook Account 4494 stated, "Got a 9 on the market p89 ruger," to which the user of Mr. James' Facebook Account replied, "Watt you want." Facebook Account 4494 responded with, "5 for you," to which the user of Mr. James' Facebook Account responded with, "Niggas jus paid 400 for a 40 compact with the beam bro . . . I give up my 38 and like 100-150" and then followed up by stating, "I'm tryna get something bigger then that 38 fcuk wit me bro I real live need dat 9."  Moreover, in a previous conversation with Facebook user 100009712651254, the user of Mr. James' Facebook Account attempted to obtain ammunition for what appears to be a .38 caliber weapon, stating, "You around I need done 38 bullets."

23.     Facebook Account 4494 and Mr. James' Facebook Account discussed what appears to be additional firearm-related transactions in other private messages.  On October 27, 2016, the user of Mr. James' Facebook Account messaged the user of Facebook Account 4494 and stated, "Wats on the market got six rite now," to which the user of Facebook Account 4494 states, "Folks got compact 1911 but he want 650."  The user of Mr. James' Facebook Account then responded, "Tell him I got six rite now."  On December 26, 2016, the user of Mr. James' Facebook Account private messaged the user of Facebook Account 4494 stating, "Got some extendos for glock 9 and 40s," referring to what appears to be high-capacity magazines. Additionally, on January 20, 2017, the user of Mr. James' Facebook Account appeared to

privately discuss obtaining bullets from the user of Facebook Account 4494, when the user of

Mr. James' Facebook Account stated, "You got some 40 eggs," to which the user of Facebook

Account 4494 responded, "Nope told you I need a re-up going today or tomorrow Walmart in

va."

24.     On August 13, 2016 the user of Mr. James' Facebook Account sent a photograph

of Mr. James holding what appears to be two firearms, a semi-automatic handgun with an

extended ammunition magazine ("Gun 1"), and an AR-15 style assault rifle, equipped with what

appears to be a laser sight ("Gun 2"), to the Facebook user ID 100004130148029 ("Facebook

Account 8029").  The user of Mr. James' Facebook Account then sent a second photograph

("Photo 2") of just Gun 2 to Facebook Account 8029, and the two users engaged in the following

conversation on Facebook's messaging platform:

>           Mr. James' Facebook Account: For Sale
>
>           Facebook Account 8029: M16 or ar 15 how much
>
>           Mr. James' Facebook Account: 600
>
>           Mr. James' Facebook Account: Semi yeah who ever come up wit the money it's
>
>           there

25.     The user of Mr. James' Facebook Account also sent Photo 2 to Facebook user ID

100012370002819 ("Facebook Account 2819") on August 13, 2016, and the user of Mr. James'

Facebook Account and the user of Facebook Account 2819 engaged in the following

conversation on Facebook's messaging platform:

>           Mr. James' Facebook Account: Got this for sale cuz
>
>           Facebook Account 2819: Ok how much
>
>           Mr. James' Facebook Account: 500 and it hold 25 in the clip

Facebook Account 2819: Ima see whats up fool

Mr. James' Facebook Account: Ard cuz ppl trna get the 🔫 up for it I'm charging errybody else 600

26.     On August 10, 2016, three days prior to this discussion, the user of Mr. James' Facebook Account privately discussed what appears to be the sale of Gun 2 in order to obtain another handgun.  Specifically, after observing a picture of a firearm in a private message with Facebook user ID 100001288117129 ("Facebook Account 7129"), the user of Mr. James' Facebook Account stated, "Hmp cuz Nigga selling something tactical for 400 beem all dat shit I'm about to sell my jawnt for six and get dat."

27.     On January 3, 2017, in a private message, the user of Mr. James' Facebook Account appeared to offer to sell Facebook account user 1130916411 ("Facebook Account 6411") high-capacity ammunition magazines, stating, "Aye fool got some glock9 and 40 extendos," to which the user of Facebook Account 6411 responded, "Aite Imma Ask Around I think Niggas Good On Clips If U find some 223 Shells Lemme know."

28.     On February 27, 2016, the user of Mr. James' Facebook Account posted a video which displays Mr. James pointing what appears to be a revolver style handgun ("Gun 3") at the camera.  On February 28, 2016, the user of Mr. James' Facebook Account posted a separate video, which displays Mr. James sitting with what appears to be Gun 3 between his legs.

29.     On April 03, 2016 the user of Mr. James' Facebook Account posted two videos of Mr. James displaying what appears to be a semi-automatic handgun ("Gun 4") in his lap.  On the same day, after these videos were posted, Facebook user ID 100000238338453 ("Facebook Account 8453") messaged Mr. James' Facebook Account the following comment, "Really Allan, that video. . Wow. When are you going to get it. Everybody know you strapped. To you have to

broadcast it."  Discussions between Facebook Account 8453 lead your affiant to conclude that the user of Facebook Account 8453 is the mother of Mr. James.

30.     On July 23, 2016, the user of Mr. James' Facebook Account posted what appears to be a Snapchat video to Mr. James' Facebook Account and described it as, "Snaps: bigyusuf_nigga."  On August 9, 2016, the user of Mr. James' Facebook Account posted Vid 1 on Mr. James' Facebook Account.  Vid 1 appears to be a Snapchat video.  Vid 1 displays three semi-automatic handguns, one of which appears to be Gun 1, referenced above.  Under the comments of Vid 1, the following conversation appears between the user of Mr. James' Facebook Account and Facebook user ID 699755732 ("Facebook Account 5732"):

> Facebook Account 5732: Tryna sell dat white one ??????

> Mr. James' Facebook Account: Nah you can trade it for something it's a glock 45.

31.     On March 17, 2017, your affiant served a search warrant to Snapchat Incorporated for information associated with Snapchat Account "bigyusuf_nigga." (SCW 1)  According to information provided by Snapchat, the registered email address associated with "bigyusuf_nigga" is Email 1, and the phone number associated with that account is (202) 910-3136.  On July 23, 2016, the user of Mr. James' Facebook Account posted what appears to be a Snapchat video to Facebook and described the video as "Snaps: bigyusuf_nigga."

32.     SCW 1 revealed two videos, timestamped on December 8, 2016 and January 12, 2017 respectively, that contained footage of an individual who appears to be Mr. James possessing multiple handguns, all of which had high capacity extended magazines. Additionally, the warrant revealed the user of "bigyusuf_nigga" posted a third video, timestamped March 10, 2017, which displays footage of what appears to be the user of "bigyusuf_nigga" driving a

vehicle, with a semi-automatic pistol at his or her side.[2] According to geolocation data contained within this video, the incident took place in Washington, D.C.

33.     On or about May 4, 2017, your affiant served a second warrant to Facebook related to Mr. James' Facebook Account (FBW 2). FBW 2 revealed an 11-minute long video, of what appears to be Mr. James in his former residence located at Address 1. In this video, which was uploaded on March 6, 2017—a couple of months prior to when his cousin stated he moved out—Mr. James appears to be in possession of a Glock-style handgun.

34.     On or about July 28, 2017, your affiant served additional warrants to Facebook (FBW 3) and Snapchat (SCW2), for the same Facebook and Snapchat accounts discussed above. SCW 2 warrant revealed no less than three videos depicting what appears to be Mr. James possessing various types of firearms, including what appears to be a Glock-style handgun with a high-capacity magazine. In one of these videos posted on May 27, 2017, Mr. James appears to be wearing a black belt with the word "Versace" stamped on it, and this black belt is tied together with a distinctive silver, metallic belt buckle that appears to be in the shape of an animal. Additionally, FBW 3 revealed that on May 24, 2017, the user of Facebook Account 7893 posted in the "Mobile Uploads" album of the account, a picture of Mr. James with what appears to be a Glock-style handgun protruding from his waistband.

35.     Based on the foregoing, your affiant concludes that there is probable cause to believe that evidence of Mr. James' possession and/or sale of firearms is likely to be found on THE DEVICE.

---

[2] The person's face is not depicted in the video, but your affiant assesses it to be Mr. James.

Digital Devices

36.     On March 9, 2017, T-Mobile provided the United States with information associated with (202)-910-3136, which is the number associated with Mr. James' Facebook account, according to records provided by Facebook.[3]   According to that information, the subscriber was listed as "Mike Smith," and the subscriber address appeared similar to a Baltimore, MD address associated with Mr. James' supervision by W-1.

37.     The subscriber of the account was assigned two separate digital devices over the course of the T-Mobile contract, which ran from approximately November 10, 2015 to November 28, 2016. The first digital device was listed as a model HTC A22, which publicly available information revealed to be an HTC Model 626 cellular telephone. Additionally, multiple photos observed by your affiant in FBW1, were uploaded by this model digital device. T-Mobile reported that this devices' ID was 352678071345539.

38.     The second digital device was listed as a model LG K7, which publicly available information research revealed to be an LG K7 cellular telephone, of which the MS330 version is utilized by MetroPCS. Multiple photos located in the "Mobile Uploads" album observed by your affiant in FBW1, were uploaded by this model digital device. T-Mobile reported that this devices' ID was 359696070212727.

39.     On or about April 6, 2017, your affiant served a search warrant to Google, Inc. seeking information related to Email 1. This search warrant revealed that Email 1 was associated

---

[3] (202) 910-3136 was registered to Metro PCS, whose records are managed by T-Mobile, until November 28, 2016. According to T-Mobile, on that date the number was ported to Sprint.

with two unique cellular devices, an HTC Model 626 (IMEI: 352678071345539), and an LG

Model MS330 (IMEI: 359696070212727).

40.      A third digital device was associated with (202) 910-3136. On November 28,

2016 the aforementioned telephone number was ported to Sprint. The search warrant served to

Google for Email 1 revealed that on November 30, 2016 the inbox of Email 1 received an email

indicating that an IPhone 6S had been activated, and the last four telephone numbers associated

to this activation were 3136. Additionally, the search warrant revealed a confirmation order for a

Gold Iphone 6S, related to the same Sprint account. No IMEI number for the telephone was

listed in this return.

41.      The third warrant to Facebook revealed another telephone number that was

utilized by Mr. James' Facebook Account. On the following dates, the user of Mr. James'

Facebook Account, in private messages, directed other Facebook users to call them at telephone

number (202)-848-6236. According to information provided by T-Mobile, this account was

activated on June 15, 2017, for a cellular telephone with IMEI number 13306002803324.

Publicly available information indicated that this digital device is an LG Model P769 Optimus

L9 cellular telephone.

42.      FBW 3 also revealed that the user of Mr. James' Facebook appeared to utilize a

fifth digital device to upload photos and then attempted to sell this digital device. On May 25,

2017, the user of Facebook account 7893 discussed the sale of a Samsung Galaxy "S8Plus"

telephone on Facebook Marketplace. In a private conversation, the user of Mr. James' Facebook

Account provides the following, unique IMEI number for the telephone: 355989081896008.

Open-source research indicates that this digital device is a Samsung Galaxy S8+ (SM-G955U)

cellular telephone.

43.     Your affiant is aware, based on my training and experience, as well as conversations with other agents, that individuals engaged in the illegal sale of weapons sometimes utilize digital devices to conduct illegal firearm transactions. Based on the totality of circumstances, Mr. James appears to have utilized multiple social media accounts, accessed by multiple digital devices, to conduct illegal firearm activity over the past year. Thus, there is probable cause to believe that Mr. James has used and uses multiple digital devices, including THE DEVICE, to facilitate the illegal sale of weapons.

**COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS**

44.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical,

and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files;

16

storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

        c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

        d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        45.      As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on

THE DEVICE, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the items described in Attachment B will be stored in THE DEVICE for at least the following reasons:

a.      Individuals who engage in criminal activity, including the illicit sale and possession of firearms use digital devices, like THE DEVICE, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like THE DEVICE, documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.  As noted in fuller detail above, and incorporated by reference herein, there is probable cause to believe that Mr. James used multiple electronic devices to store and share photographs of firearms and engage in conversations about the illicit sale of firearms.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

18

c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

46.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how THE DEVICE  was used, the purpose of its use, who used it (or did not), and

when.  Based on my knowledge, training, and experience, as well as information related to me by

agents and others involved in this investigation and in the forensic examination of digital

devices, I respectfully submit there is probable cause to believe that this forensic electronic

evidence and information will be in any of THE DEVICE because:

a.      Although some of the records called for by this warrant might be found in

the form of user-generated documents or records (such as word processing, picture, movie, or

texting files), digital devices can contain other forms of electronic evidence as well.  In

particular, records of how a digital device has been used, what it has been used for, who has used

it, and who has been responsible for creating or maintaining records, documents, programs,

applications, and materials contained on the digital device(s) are, as described further in the

attachments, called for by this warrant.  Those records will not always be found in digital data

that is neatly segregable from the hard drive, flash drive, memory card, or other electronic

storage media image as a whole.  Digital data stored in THE DEVICE, not currently associated

with any file, can provide evidence of a file that was once on the storage medium but has since

been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted

from a word processing file).  Virtual memory paging systems can leave digital data on a hard

drive that show what tasks and processes on a digital device were recently used.  Web browsers,

e-mail programs, and chat programs often store configuration data on a hard drive, flash drive,

memory card, or memory chip that can reveal information such as online nicknames and

passwords.  Operating systems can record additional data, such as the attachment of peripherals,

the attachment of USB flash storage devices, and the times a computer, smart phone, or other

digital device was in use.  Computer, smart phone, and other digital device file systems can

record data about the dates files were created and the sequence in which they were created.  This

data can be evidence of a crime, indicate the identity of the user of the digital device, or point

toward the existence of evidence in other locations.  Recovery of this data requires specialized

tools and a controlled laboratory environment, and also can require substantial time.

   b.   Forensic evidence on a digital device can also indicate who has used or

controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.  For example, registry information,

configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs,

photographs, the presence or absence of malware, and correspondence (and the data associated

with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or

controlled the digital device at a relevant time, and potentially who did not.

   c.   A person with appropriate familiarity with how a digital device works can,

after examining this forensic evidence in its proper context, draw conclusions about how such

digital devices were used, the purpose of their use, who used them, and when.

   d.   The process of identifying the exact files, blocks, registry entries, logs, or

other forms of forensic evidence on a digital device that are necessary to draw an accurate

conclusion is a dynamic process.  While it is possible to specify in advance the records to be

sought, digital device evidence is not always data that can be merely reviewed by a review team

and passed along to investigators.  Whether data stored on digital devices is evidence may

depend on other information stored on the devices and the application of knowledge about how

the devices behave.  Therefore, contextual information necessary to understand other evidence

also falls within the scope of the warrant.

   e.   Further, in finding evidence of how a digital device was used, the purpose

of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is

not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

47.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a

controlled environment, such as a law enforcement laboratory or similar facility, is often

essential to conducting a complete and accurate analysis of data stored on digital devices.

       c.      Further, as discussed above, evidence of how a digital device has been

used, the purposes for which it has been used, and who has used it, may be reflected in the

absence of particular data on a digital device.  For example, to rebut a claim that the owner of a

digital device was not responsible for a particular use because the device was being controlled

remotely by malicious software, it may be necessary to show that malicious software that allows

someone else to control the digital device remotely is not present on the digital device.  Evidence

of the absence of particular data or software on a digital device is not segregable from the digital

device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular

data or software requires specialized tools and a controlled laboratory environment, and can

require substantial time.

       d.      Digital device users can attempt to conceal data within digital devices

through a number of methods, including the use of innocuous or misleading filenames and

extensions.  For example, files with the extension ".jpg" often are image files; however, a user

can easily change the extension to ".txt" to conceal the image and make it appear that the file

contains text.  Digital device users can also attempt to conceal data by using encryption, which

means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the

data into readable form.  Digital device users may encode communications or files, including

substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby

thwarting "keyword" search techniques and necessitating continuous modification of keyword

terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend

themselves to keyword searches.  Some applications for computers, smart phones, and other

digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

      e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in

criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.       Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

48.    In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.       THE DEVICE, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.       The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall

25

not be limited to, surveying various file "directories" and the individual files they contain

(analogous to looking at the outside of a file cabinet for the markings it contains and opening a

drawer believed to contain pertinent files); conducting a file-by-file review by "opening,"

reviewing, or reading the images or first few "pages" of such files in order to determine their

precise contents; "scanning" storage areas to discover and possibly recover recently deleted data;

scanning storage areas for deliberately hidden files; and performing electronic "keyword"

searches through all electronic storage areas to determine whether occurrences of language

contained in such storage areas exist that are related to the subject matter of the investigation.

49.     In searching the digital devices, the forensic examiners may examine as much of

the contents of the digital devices as deemed necessary to make a determination as to whether the

contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic

examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to

determine whether the contents fall within the items to be seized as described in Attachment B.

Any search techniques or protocols used in searching the contents of the seized digital devices

will be specifically chosen to identify the specific items to be seized under this warrant.

## <u>CONCLUSION</u>

50.     I submit that this affidavit supports probable cause for a warrant to search the

DEVICE described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,


Robert Mayo
Special Agent, FBI


Subscribed and sworn to before me on _____, 2017


_____
THE HONORABLE ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE